# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
January 16, 2002 Session

## STATE OF TENNESSEE v. DONDIE TIDWELL

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-46136A     James K. Clayton, Jr., Judge**

---

**No. M2000-2628-CCA-R3-CD - Filed December 18, 2002**

---

A Rutherford County jury convicted the defendant, Dondie Eugene Tidwell, of two counts of first degree murder, one count of conspiracy to commit first degree murder, one count of especially aggravated kidnapping, and one count of theft over $10,000. The trial court merged the defendant's two first degree murder convictions and ordered the defendant to serve twenty-three years for his conspiracy to commit first degree murder conviction, twenty-three years for his especially aggravated kidnapping conviction, and four years and six months for his theft conviction. The trial court ordered these sentences to run concurrently to each other and consecutively to the defendant's sentence for his merged first degree murder conviction, life without the possibility of parole. Thus, the defendant received an aggregate sentence of life without the possibility of parole plus twenty-three years. The defendant now brings this appeal, challenging his convictions and his sentence on the bases that (1) the trial court erred by refusing to allow him to excuse a juror using a peremptory challenge; (2) the evidence introduced at trial is insufficient to support his convictions; (3) the prosecutor made inappropriate comments when delivering the state's opening statement; (4) the trial court erred by allowing an expert to testify on subjects beyond the scope of that witness's expertise; (5) the trial court erred by refusing to allow him to introduce evidence of the drugs that were present in the victim's system at the time of the victim's death; (6) the trial court instructed the jury incorrectly on the charge of conspiracy; (7) the trial court erred by admitting a photograph of the victim taken after the victim's death during the sentencing phase of the trial; (8) the trial court erred by refusing, in the sentencing phase, to allow the defendant to compare his potential sentence to the sentence received by his co-conspirator; (9) the trial court erred by allowing the introduction of certain hearsay evidence; (10) the prosecutor exceeded the permissible scope of his rebuttal closing argument; and (11) the trial court erred by imposing consecutive sentencing. After reviewing the record, we find that the trial court did err by refusing to allow the defendant to exercise a peremptory challenge and that therefore the defendant is entitled to a new trial on this basis. However, we find that the remainder of the issues presented in this appeal have either been waived or lack merit.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Reversed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

John B. Nisbet, III, Cookeville, Tennessee; Larry M. Warner, Crossville, Tennessee; and Larry F. Wallace, LaVergne, Tennessee, for appellant, Dondie Tidwell.

Paul G. Summers, Attorney General & Reporter; Jennifer L. Bledsoe, Assistant Attorney General; and William C. Whitsell, Jr., District Attorney General for appellee, State of Tennessee

**OPINION**

**Factual Background**

On July 17, 1996, the body of the victim, Greg Dodson, was discovered. The defendant and Chris Stacey, the defendant's co-conspirator, were convicted of murdering him. The defendant and Stacey were related to the victim by marriage. The victim's wife, Joy Dodson, was Stacey's sister and the defendant's aunt. The defendant, Stacey, and Ms. Dodson are of Caucasian descent, whereas the victim was an African-American. Although the victim and Ms. Dodson had experienced marital problems that had led the victim to move back temporarily into his mother's home in Baltimore, the couple had decided to attempt a reconciliation, in part on behalf of their two small children. At the time of the victim's murder, Stacey was living with Ms. Dodson and cared for her children while she was at work.

On the 17th Ms. Dodson left for work and told Stacey that the victim might visit the children that day. When she returned home very late that night, Stacey, uncharacteristically, was still awake. According to Ms. Dodson, Stacey told her that the victim had visited the children and said that he would call Ms. Dodson at approximately 11:00 a.m. Ms. Dodson also indicated that the defendant had not approved of her relationship with the victim because of the victim's race. She added that the defendant had threatened to "take care of the victim" when he returned to Tennessee, but Ms. Dodson had not taken the defendant seriously.[1]

Unbeknownst to Ms. Dodson, that same night, Stacey had attempted to sell a white Nissan Stanza for $500.00, which was later found to belong to the victim. Stacey encountered Jimmy Daniel Prater at a convenience store located in Murfreesboro. Although this was the first time that he and Prater had met, Stacey offered to sell Prater the car and its contents. Prater got into the Stanza with Stacey to pick up some clothing included in the deal.[2] On the way Stacey stopped at a bridge, jumped from the car, and retrieved a shotgun wrapped in a towel from under the bridge. Prater also saw 12 gauge, No. 6 shot, shells laying in the road where Stacey recovered the shotgun. Stacey also discarded a spent cartridge from the weapon. Ultimately, Prater drove Stacey to his apartment and arranged to meet Stacey the following day at approximately dinner time with the money for the sale

---

[1] In addition, another witness, Kimberly Brown, recounted a threat that the defendant had made against the victim.

[2] The victim had begun selling clothes on the side as a means of earning extra income.

of the Stanza. Once Prater purchased the car and was inspecting the car's contents, he discovered the victim's social security card, driver's license, and personal belongings in the car and therefore decided to contact the police. It was determined by police that the car belonged to the victim. The subsequent police investigation led to the discovery of the victim's body and Stacey's arrest. The following day the defendant was also arrested.

The victim's autopsy revealed that the victim received a shot to the head that resulted in his death. From this examination, the medical examiner opined that the shot had been fired somewhere around zero to twenty-four inches from the victim's head. Because of the damage caused by the blast, the examiner was unable to determine if the killer(s) had also beaten the victim about the head with a baseball bat or other object. A bat with blood matching the victim's blood type had been found in the Stanza.

At around 9:30 p.m. on the night of the murder, the victim participated in a three-way phone call with two friends, Dina Ivey and Teri Moman, to let them know that he had returned to the area. During this phone call, both Ivey and Moman heard voices in the background that they identified as the voices of the victim's children, the defendant, and Stacey. Moman testified that the victim abruptly ended the conversation by stating that he needed to leave.

At approximately 9:30 to 10:00 p.m. on the evening of the victim's murder, Vivian Knox, one of Ms. Dodson's neighbors in their apartment complex, heard an argument erupt in Ms. Dodson's apartment. She heard two or three voices arguing, and the commotion caused objects to fall off of her walls. Soon afterward, she observed the victim walking to his car with his hands wrapped in a towel in front of him. Stacey followed behind and pushed the victim into the car while telling him that he was taking the victim to the hospital to treat his arm. Around 30 minutes later, Knox saw Stacey return, but did not see the victim in the car. At approximately 10:15 p.m., a racoon hunter in Rutherford County heard two or three people talking, loud music, and one shotgun blast sound from the general area where the victim's body was later found.

The defendant told his girlfriend, Sherry Harris, that he had not been involved in the victim's murder, but later he admitted to being present during the commission of the murder. In his revised account to Harris, he followed the victim and Stacey, bringing the victim's children with him, and when Stacey removed the shotgun from the defendant's trunk, the defendant claimed that he left. However, the defendant also told Steven Mitchell Riggan, a former fellow inmate, that he and Stacey waited for the victim to arrive and planned to beat the victim, tie him, and kill him. The defendant later stated that he and Stacey had restrained the victim and beaten him with a bat, but that he had not shot the victim.

Finally, Stacey testified and assumed considerable blame for the victim's assault, abduction, and murder. He admitted that he had taken a concrete tool and baseball bat into the victim's apartment. Stacey also claimed that the defendant had struck the victim a couple of times but that the defendant had not been involved in tying the victim, despite Stacey's request that he do so. He further testified that the defendant had flashed his lights when Stacey had turned the opposite direction from the hospital where Stacey was supposedly taking the victim. Moreover, Stacey claimed that the defendant had tried to talk him out of shooting the victim and that the defendant had left the murder scene only after being told to mind his own business. However, Stacey acknowledged that he lied to the authorities concerning the murder and that he had previously claimed that the defendant played a greater role in the commission of the crimes. Specifically,

Stacey once told police officers that the defendant convinced Stacey to become involved, that the defendant had struck the victim "a lot," and that the defendant had told Stacey, "Come on, man, finish him off. Let's get him out of here."[3] This concluded the proof.

## Peremptory Challenge

The defendant argues that the trial court erred by reinstating a juror after the defendant struck that juror by using a peremptory challenge. Specifically, the defendant argues that the trial court did not follow the mandates of State v. Spratt, 31 S.W.3d 587 (Tenn. Crim. App. 2000), which outlines the procedure that a trial court must follow when determining whether a party has exercised a race-based peremptory challenge. The state counters that the trial court did follow the required procedure and that the trial court's reinstatement of the juror was proper and supported by the court's findings.

During a jury-out bench conference at the conclusion of the initial portion of voir dire, the prosecutor noted that two of the twelve prospective jurors then selected were African-Americans. The prosecutor noted this fact to the trial court "so it doesn't come out in court." When the jury returned, the process of excusing jurors with peremptory challenges began, and three jurors were initially struck as a result of peremptory challenges. When the second set of challenges were presented to the trial court, the prosecutor requested a hearing in chambers. Once in chambers, the following colloquy, which is a complete transcript of the in-chambers hearing, took place:

General Jackson: Your Honor, may it please the Court, we're on the record now. This is concerning the Court's bringing it to our attention that the defense now has challenged Mr. Jeffrey Webster. I would note to the Court that he is one of two African American jurors that is on the venire at this time. And I'm not sure that there are others. I know there was one other African American who said he had a problem earlier this morning.

The Court: Yes.

General Jackson: He has not found his way onto the jury yet even this far.

In the colloquy of questions that were propounded to the jury, the only response that has come from this juror, be he examined by the State or defense, is that he has had some prior legal training that has answered, also. I would point out this fact. That was not went into in any detail by any party. And I would challenge this as being simply an attempt on the part of the defense to take off an African American.

And based on the makeup and the facts of this case, one of the linchpins that the State will advance in this case is that this murder anticipated by this Defendant was motivated by race and hatred by the fact that his aunt was in an interracial marriage. This had evidenced itself by statements

---

[3] The jury also heard a video-taped statement made by the defendant. However, as discussed infra, neither the tape nor the transcript of the tape has been included in the appellate record.

-4-

| | |
|---|---|
| | made by this Defendant, not only before his aunt but others. That's our theory. We don't believe it could be anything other than that. I challenge them to make a response and show how it is otherwise. |
| The Court: | All right. |
| Mr. Warner: | Your honor, Mr. Webster is a manager and works in human resources. The reason we challenged him is that we are afraid he would use those managerial skills and become a leader on this jury. We are seeking to have a leaderless jury. And he is very highly educated. If you'll notice, that is consistent with our other challenges. The first challenge out of the box was on the gentleman that is a Ph.D. |
| The Court: | Yeah, the doctor. |
| Mr. Warner: | For the same reason. |
| The Court: | Okay. |
| Mr. Warner: | And if you'll notice it, they're both landlords. I don't know that that really matters. |
| The Court: | If it does, I'm a landlord. |
| General Jackson: | Judge, if you look at the venire – and I don't have my jury seating chart – you will see, your Honor, that there are a number of people with education beyond highschool. I see an MBA on here, master's degrees. Of course, we discussed the Ph.D. that was on there. There are other people in leadership.<br><br>I believe that that's just simply a bootstrapping of this case. They didn't go into that, had that been a problem. They don't know what he does. The know simply what they've told the Court. If that was a real problem, then they could have went into more depth with that. I do not believe that that holds water in this case, and I would ask the Court to deny this argument. |
| The Court: | Well, I show here that he is in human resources at Nissan, in employee relations. I don't know that that's going to give him any leg up on anybody else as far as being a leader of people. |
| General Jackson: | Your Honor, just to give an example. What about Prentice Alsup, a self-employed businessman? Was he questioned? Was that brought up about him? Has he been kicked off?<br><br>Dropping down to James Beck, warehouse employee, 59 years old. Has anything been said about him? Has there been one sought against him?<br><br>Dropping on down from that, take Gregory Cook, a bachelor of arts, St. Thomas Hospital. What does he do? |

|  |  |
|---|---|
|  | Does he have managerial powers? Has there been a challenge as to him? |
| The Court: | Well, they're not through with their challenges yet. |
| General Jackson: | Exactly. But the point of it is, there was nothing propounded to him to go into detail about this. I submit that whatever might have been on that, they would have twisted someway in utilizing that to say this to the Court now. It is just not sufficient based on the fact that it is exclusionary, and that is what the Court has to guard against, is a jury that excludes people because of their race just to somehow advance the issues of whoever the litigants are, be they defense or prosecution. |
|  | We are held to that standard, and I don't think the Court would buy our argument if that's what I advanced to the Court. |
| The Court: | Well, you're probably right, General. I probably wouldn't. |
| General Jackson: | And the Defendant has no more right in this hunt than anybody else because the issue is not the protection of anybody's rights that are litigants. It is a protection of a class from being excluded in participating in this, the greatest of our liberties in our government. |
| The Court: | Mr. Warner. |
| Mr. Warner: | Your Honor, my jury expert – and I'm quoting exactly regarding Mr. Webster. "As a human resources manager, he is likely to be unduly effective in influencing other jurors. As a rule, a leaderless jury is better for the defense." |
|  | That's what an expert told me. I haven't written that down myself. |
| General Jackson: | That doesn't hold any water here. I've talked to an expert. I talked to Mr. Newman. It's the same thing. There have been no qualifications about this, and that means nothing to this Court. That's a nullity. |
| The Court: | Well, it seems to me that the fact that a person might be a leader of course is questionable because you never know who's going to be a leader of a jury. |
| General Jackson: | But we do know what race he is and how many people of that race are here to be on this jury. And they're excluding him, your Honor, and I'm asking this Court straight up as a legal matter to not let that happen in this case. |
| The Court: | I don't think that's a valid reason, is my line of thinking. |
| General Jackson: | Thank you. Thank you. Appreciate it. |
| Mr. Wallace: | Judge, in Batson v. Kentucky, it simply says that we must advance a race-neutral reason. |

| | |
|---|---|
| General Jackson: | Judge, you can't stop at <u>Batson</u>. You've got to go forward. That's old law now. You've got to go into the future. And you've had the case that gives you this rule about the defense cannot challenge people based on race, <u>Georgia v. McCollum</u>, United States Supreme Court case. And down to the one that applies here on us in Tennessee, <u>Woodson v. Porter Brown Limestone</u> that I've told the Court about. |
| The Court: | I wish we didn't have this problem. |
| General Jackson: | I wish we didn't either, but we do. |
| The Court: | But we do. If we didn't have it, it would be a lot simpler. Sometimes it doesn't make a whole lot of sense to me that you can challenge any of the other jurors in the venire, but that's what the law says, that you have to have an articulable reason. I have to make a finding of fact, and we don't know whether Mr. Webster, the fact that he's in human relations. |
| General Jackson: | Human Resources. |
| The Court: | Human resources, in the personnel department, in the employee relations department down at Nissan, that he's going to have any more influence on the jurors than anybody else. |
| General Jackson: | Thank you, your Honor. |

Approximately one month after the defendant's trial, this Court published <u>State v. Spratt</u>, 31 S.W.3d 587 (Tenn. Crim. App. 2000). In <u>Spratt</u>, we addressed peremptory challenges and the law governing a trial court's determination of whether a party has improperly exercised a race-based peremptory challenge.

"The peremptory challenge is one of the oldest established rights of the criminal defendant." <u>United States v. Annigoni</u>, 96 F.3d 1132, 1136 (9th Cir. 1996). For more than one hundred years, the United States Supreme Court has recognized that peremptory challenges are "an essential part of the trial." <u>Lewis v. United States</u>, 146 U.S. 370, 376, 13 S. Ct. 136, 138, 36 L. Ed. 1011 (1892). The Supreme Court has also stated that the right of peremptory challenge is "one of the most important of the rights secured to the accused." <u>Pointer v. United States</u>, 151 U.S. 396, 408, 14 S. Ct. 410, 414, 38 L. Ed. 208 (1894). The importance of the right to make peremptory challenges is demonstrated by the extraordinary remedy courts have traditionally afforded to an accused who was deprived of the right: reversal of conviction, without a showing of prejudice. <u>Lewis</u>, 146 U.S. at 376, 13 S. Ct. at 138.

"Peremptory challenges, along with challenges for 'cause,' are the principal tools that enable litigants to remove unfavorable jurors during the jury selection process." <u>Annigoni</u>, 96 F.3d at 1137. "The central function of the right of peremptory challenge is to enable a litigant to remove a certain number of potential jurors who are not challengeable for cause, but in whom the litigant perceives bias or hostility." <u>Id.</u> "The

function of the [peremptory] challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise." Swain v. Alabama, 380 U.S. 202, 219, 85 S. Ct. 824, 835, 13 L. Ed. 2d 759 (1965), overruled on other grounds, Batson, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69.

Spratt, 31 S.W.2d 597-98.

In Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the United States Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." Id., 476 U.S. at 89, S. Ct. at 1718. In Georgia v. McCollum, 505 U.S. 42, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992), the Supreme Court extended this rule to prohibit defendants from striking jurors on the basis of their race. McCollum, 505 U.S. at 59, 112 S. Ct. at 2359. Thus, the State may make a "reverse Batson objection." State v. Hathaway, 1997 Tenn. Crim. App. LEXIS 1342, No. 02C01-9702-CR-00082, 1997 WL 793505, at *6 (Tenn. Crim. App. at Jackson, Dec. 30, 1997), app. denied, (Tenn. Oct. 12, 1998).

To invoke the protections of Batson and its progeny, the State must establish a prima facie case that a juror is being challenged on the basis of race. Purkett v. Elem, 514 U.S. 765, 767, 115 S. Ct. 1769, 1770-71, 131 L. Ed. 2d 834 (1995); Batson, 476 U.S. at 93-94, 106 S. Ct. at 1721. Once the State has presented a prima facie case, the trial court shall require the defendant to give a race-neutral reason for the challenge. Purkett, 514 U.S. at 767, 115 S. Ct. at 1770-71; McCollum, 505 U.S. at 59, 112 S. Ct. at 2359. "The race or gender neutral explanation need not be persuasive, or even plausible. . . . Unless a discriminatory intent is inherent in the [proponent's] explanation, the reason offered will be deemed race neutral." Purkett, 514 U.S. at 767, 115 S. Ct. at 1770-71. If a race or gender neutral explanation is given, the court must then determine, given all the circumstances, whether the State has established purposeful discrimination. Purkett, 514 U.S. at 767, 115 S. Ct. at 1770-71; Batson, 476 U.S. at 96-98, 106 S. Ct. at 1723-24.

"The trial judge must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination." Woodson v. Porter Brown Limestone Co., Inc., 916 S.W.2d 896, 906 (Tenn. 1996). "The trial court's factual findings are imperative in this context." Id. "On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous." Id. (citation omitted). "Thus, specificity in the findings is crucial." Id.

Spratt, 31 S.W.3d at 595-96.

In Spratt, a factually analogous case, the defendant struck several jurors using peremptory challenges, and the state objected, arguing that the defense was striking jurors based solely on their race. Id. at 595. The trial court reseated some of these jurors after determining that these jurors were struck solely on the basis of their race. Id. However, the trial court failed to state its findings supporting this ruling with any specificity. Id. at 596. This Court determined that the trial court erroneously applied the Batson test and therefore improperly reinstated the jurors. Id. at 596-97 Specifically, in Spratt we found that although the trial court properly applied the first prong of the Batson test and correctly determined that the state raised a prima facie case of discrimination, "the trial court erroneously combined parts two and three and placed the burden on Defendant both to propose race-neutral reasons for the challenges and then prove that the race-neutral reasons where [sic] in fact the actual reasons." Id. at 596. We deemed this "improper," noting that the United States Supreme Court has explained that "'the ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the opponent of the strike.'" Id. (quoting Purkett, 514 U.S. at 798, 115 S. Ct. 1769).

In the instant case, we find that the trial court's analysis was similarly erroneous. As discussed supra, the trial court correctly determined that the state had offered a prima facie case of discriminatory intent.[4] The defendant advanced his race-neutral reason for striking Juror Webster, namely that the defendant feared that the juror's vocation indicated that the juror could easily assume a leadership role in the jury. The defendant's jury expert had advised him not to retain human resources managers because they are "likely to be unduly effective in influencing other jurors," and a leaderless jury is generally best for the defense. However, although the race-neutral explanation "need not be persuasive, or even plausible," Puckett, 514 U.S. at 767, it appears that rather than weighing the totality of the circumstances and determining whether the state had met its burden of proving that the strike was race-based, the trial court, like the trial court in Spratt, instead shifted the burden of proving that the strike was not racially motivated to the defendant; the trial court found that the defendant's explanation was not a legitimate reason for striking a juror and that therefore the defendant's reason for striking the juror must be racially motivated.

We conclude that, under the totality of the circumstances, the state failed to establish that the defendant acted with purposeful discrimination when moving to strike Juror Webster. The defendant offered a persuasive race-neutral reason for striking Juror Webster, namely that he feared that Juror Webster would unduly influence his fellow jurors and become a leader on the jury, a probability that the defendant's jury expert warned could be detrimental to the defendant's case. The legitimacy of the defendant's concern is evidenced by the fact that the jury eventually elected Juror Webster to serve as the jury foreperson. "When a defendant is wrongly deprived of peremptory challenges because of a trial court's erroneous application of the Batson test, the remedy is a reversal of the conviction and a remand for a new trial." Id. at 598 (citing United States v. McFerron, 163 F.3d 952, 955 (6th Cir. 1998)). Therefore, we reverse the defendant's convictions and remand his case for a new trial. However, in the event of further appeal, we will address the defendant's other allegations of error.

---

[4] At the time the defendant moved to strike Juror Webster, the venire was comprised of two African-Americans. While the defendant's attempt to strike one of these two individuals may be prima facie evidence of a discriminatory intent, it is not conclusive evidence of such intent.

**Sufficiency**

The defendant challenges the sufficiency of the evidence introduced at trial to support his convictions. When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" state's witnesses and resolves all conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the state "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Tilson, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

The jury convicted the defendant of two counts of first degree murder, one count of conspiracy to commit first degree murder, one count of especially aggravated kidnapping, and one count of theft of property over $10,000.[5] The state introduced evidence at trial that, prior to the day of the murder, the defendant had called the victim racial epithets and threatened the victim's life. The state also introduced evidence that the defendant was present at the victim's apartment on the evening of the murder, present during the victim's murder, and was seen both leaving the victim's apartment shortly before the time of his murder and returning to the apartment with the victim's children later that evening. Furthermore, the state also introduced evidence that the defendant admitted to a former fellow inmate that he and Stacey planned to beat, restrain, and shoot the victim and that they had waited for the victim to arrive at the apartment in order to do so. This witness also testified that the defendant admitted that he hit the victim with a baseball bat and that his motivation for killing the victim was greed. Based on the foregoing evidence, we conclude that a rationale jury could have found the defendant guilty first degree murder, conspiracy to commit murder, especially

---

[5] At trial, the state played the defendant's video-taped statement for the jury and provided the jury with a transcript of the recording. From the references to this video-taped statement in the trial transcript, we gather that the state played a video-taped recording of the defendant's police interview for the jury and that in this interview, the defendant discussed his involvement in the instant crimes. Undoubtedly, the jury could have used the information contained in this recording as a basis of its guilty verdicts, especially if the defendant made self-incriminating statements in the recording. Neither this tape recording nor the transcript of it appear in the record on appeal. Although it is usually the duty of the appellant to furnish this Court with a complete record for review, in such an instance as this prudence would dictate that the State ensure that all of its incriminating proof is included in the record on appeal. Regardless of this omission, we find that there is sufficient evidence based on the portion of the appellate record before us to support the defendant's convictions.

aggravated kidnapping, and theft over $10,000. Thus, the defendant's sufficiency challenge lacks merit.


## Propriety of the Prosecutor's Opening Statement

The defendant complains that the prosecutor made improper remarks in his opening statement by stating that "I'm just going to basically tell you what I believe that the proof is going to be and what I think you're going to hear," as well as other "I believe" and "I think" statements. The defendant argues that the prosecutor's remarks regarding what he believed constitute a violation of his ethical duty to refrain from asserting his own "personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused." Tenn. Sup. Ct. R. 8 DR 7-106(C)(4). The state counters by noting that the defendant has waived this issue on appeal by failing to make a contemporaneous objection at trial and by failing to prove how the statement was improper or how he was prejudiced by the prosecutor's remarks.

We agree with the state that the defendant has waived this issue by failing to make a contemporaneous objection to the prosecutor's remarks at trial. See, e.g., State v. Everett D. Cain, No. 02-C-01-9504-CR-00104, 1996 Tenn. Crim. App. LEXIS 461, at *9 (Tenn. Crim. App. at Jackson, July 26, 1996) (stating that "[t]he failure to make a contemporaneous objection when the assistant district attorney general made the comment during his opening statement constituted a waiver of this issue" and citing Tenn. R. App. P. 36(a); State v. McPherson, 882 S.W.2d 365, 373 (Tenn. Crim. App. 1994); State v. Gregory, 862 S.W.2d 574, 578 (Tenn. Crim. App. 1993); and State v. Thomas, 818 S.W.2d 350, 364 (Tenn. Crim. App. 1991)). Moreover, the defendant has failed to prove that the prosecutor's remarks were improper, as this Court has previously held that similar "I believe"remarks are not expressions of an attorney's personal opinion. See Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995) (stating that "if argument is predicated by the words 'I think' or 'I submit,' it is unlikely to be adjudged as a personal opinion" and citing United States v. Stulga, 584 F.2d 142 (6th Cir. 1978)), overruled on other grounds by State v. West, 119 S.W.3d 753 (Tenn. 2000). Finally, assuming that the prosecutor's remarks were improper, the defendant has also failed to allege how he was prejudiced by those remarks, and the defendant must prove prejudice in order for this Court to grant his requested relief. See State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994) (instructing that when a prosecutor makes improper remarks during a closing argument, the appellate court must determine "whether the impropriety affected the verdict to the prejudice of the defendant"). For these reasons, we find that this issue lacks merit.


## Scope of Expert's Testimony

The defendant alleges that the trial court erred by allowing an expert qualified in the fields of firearm identification, muzzle to garment distance determination, and toolmark examination to testify beyond the scope of his expertise, namely on the subject of whether the shotgun shell wadding at issue was damaged by passing through the victim's skull and brain tissue. The state maintains that

the record supports the trial court's decision because the testimony dealt with the cause of damage to the wadding, a subject on which the expert was qualified to testify.

Tennessee Rule of Evidence 702, entitled "[t]estimony by experts," states that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Tennessee Rule of Evidence 703, entitled "[b]ases of opinion testimony by experts," states that

> [t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703. Furthermore, "in general, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. The trial court's ruling in this regard may only be overturned if the discretion is arbitrarily exercised or abused." McDaniel v. CSX Transp. Inc., 955 S.W.2d 257, 263-64 (Tenn. 1997), (citing State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993)).

As mentioned supra, in the instant case, the trial court qualified the witness at issue as an expert in the fields of firearm identification, muzzle to garment distance determination, and toolmark examination. During direct examination, the prosecutor and the expert witness had the following exchange:

Q:    Now I have a hypothetical question for you. I want you to assume that the victim in this case, that the shotgun was placed against the back of the victim's head. I want you to assume further that the gun was fired while in contact with the back of the victim's head. I want you to assume that the pellets and the wadding enter the back of the victim's head. I want you to further assume that an x-ray was taken. . . . I want you to assume further that this x-ray was taken and this was the results of the x-ray [referencing an x-ray taken of the victim's head].

A:    Yes, sir.

Q:    And I want you to assume further that at the autopsy Dr. Harlan removed a sampling of the pellets and submitted them to your examination. I want you also to assume further that the wadding given to you for examination was also obtained at the autopsy and was removed from the brain and the skull of the victim. And then I could have this question for you. Could the damage that you observed, which results now in you being unable to tell us whether it was a 12 or a 16 gauge wadding, be caused by the wadding passing through the skull and the brain tissue of the victim?

A:      The wadding – [Witness interrupted by defense's objection, which is argued and overruled.]  The damage to these type of waddings, these are fibrous, cardboard type waddings. That means they're not very strong.  Damage can be created by bones, and those type of things can damage wads as they go into and penetrate into a person.  So that is a possibility, yes.

The defendant objected to the prosecutor's question on the basis that it delved into a subject beyond the scope of the witness's expertise, requiring him to testify about human anatomy.  The prosecutor countered that the question did not call for the witness's expertise in anatomy, but rather required him to draw upon his expertise regarding possible causes of damage to shotgun wadding. Indeed, based on the witness's response to the hypothetical question, it is evident that the question called upon the witness's knowledge of the composition of the shotgun wadding recovered from the victim and what possible effect the collision with the victim's skulls and brain tissue could have had on the wadding.  Accordingly, because the witness was testifying regarding his knowledge of firearms, we find that the trial court did not err by allowing him to answer the prosecutor's hypothetical question. This issue lacks merit.

### Admissibility of Evidence of Drugs in the Victim's System

The defendant argues that the trial court's grant of the state's motion in limine to exclude evidence of cocaine found in the victim's system during the victim's autopsy interfered with his right to present a defense at trial.  In support of his argument, the defendant cites State v. Brown, 29 S.W.3d 427 (Tenn. 2000), which outlines the factors to consider when determining "whether the constitutional right to present a defense has been violated by the exclusion of evidence."  Brown instructs that "the analysis should consider whether (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." Id. at 433-34.

In the instant case, the trial court ruled to exclude evidence that the victim had a trace amount of cocaine in his system at the time of his death after the medical examiner who performed the victim's autopsy testified that this amount of cocaine in the victim's system would have no bearing on his actions, reactions, emotions, or manner of death. The defendant complains that this ruling interfered with his ability to present a defense, but he fails to allege how this omitted evidence was critical to his defense.  Accordingly, per Brown, he has not alleged appropriate grounds for relief. Thus, this issue lacks merit.

### Jury Instructions Regarding Conspiracy

The defendant argues that the trial court erred by granting the state's motion to amend the pattern jury instruction on conspiracy to commit first degree murder by adding the following language:

Now, a conspiracy, in general terms is a combination of two or more persons by some concerted action to accomplish some criminal act or unlawful purpose. No formal agreement between the parties to do the act charged is necessary to constitute a conspiracy, it being sufficient that the minds of the parties meet understandingly.

When a conspiracy is established, the act or declaration of one conspirator in the prosecution of the common enterprise is considered the act of all and is evidence against all.

To prove the existence of a conspiracy, it is [sic] necessary that the prosecution show the existence of a formal agreement between the parties to do the unlawful act. A mutual implied understanding is sufficient, although not manifested by any formal words or by a written agreement. Conspiracy implies concert of design and not participation in every detail of execution.

The unlawful confederation may be established by circumstantial evidence and by the conduct of the parties in the execution of the criminal enterprise. The act of one in furtherance of a conspiracy is considered the act of all and, therefore, is imputable to all. Everyone who enters into a conspiracy is a party to every act which has before been done by the others and to every act by the others afterwards in furtherance of a common design.

A defendant has the constitutional right to complete and accurate jury instructions on the law, and the trial court's failure to provide complete and accurate jury instructions deprives a defendant of the constitutional right to a jury trial. See State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Erroneous jury instructions are subject to harmless error review. State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). However, if the error is constitutional in nature, there must be a reversal unless the error is harmless beyond a reasonable doubt. Id.

The defendant argues that the trial court's inclusion of this additional language was erroneous because the language inaccurately defines conspiracy and because the language deviates from the pattern jury instruction. However, the additional language charged reflects an accurate statement of the law regarding criminal conspiracy, with the exception that it erroneously omits the word "not" as indicated by the "sic" notation above. We note that this omission would tend to benefit rather than prejudice the defendant. Furthermore, a trial court does not err by deviating from a pattern jury instruction, provided that the instruction given is accurate. See State v. West, 844 S.W.2d 144, 151 (Tenn. 1992) ("There is no requirement limiting a trial court to the use of 'pattern instructions.'"). Therefore, we conclude that the trial court did not err by including this additional language in the jury charge. Thus, this issue lacks merit.

### Admission of Victim's Photograph During Sentencing Phase

The defendant argues that the trial court erred by admitting an autopsy photograph of the victim because the prejudicial nature of the photograph outweighs its probative value. The photograph depicts the victim's face, which has been deformed due to the injuries that the victim sustained. The trial court admitted the photograph on the basis that it was probative on the issue of whether the victim's death was especially heinous, atrocious, or cruel. However, the defendant

argues that the medical examiner testified regarding the nature, extent, and seriousness of the victim's injuries and that therefore the picture was not necessary for the state to prove this enhancement factor.

In State v. Hall, 8 S.W.3d 593 (Tenn. 1999), our supreme court addressed Defendant Hall's complaint that the victim's photograph was introduced during the sentencing phase in order to prove that the victim's death was especially heinous, atrocious, or cruel.

> The admissibility of photographs is generally within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). The admissibility of evidence at a capital sentencing hearing is controlled by Tenn. Code Ann. § 39-13-204(c) (1991), which allows the admission of any evidence "the court deems relevant to the punishment . . . regardless of its admissibility under the rules of evidence," subject to a defendant's opportunity to rebut any hearsay statements and to constitutional limitations.

> Historically, photographs depicting a victim's injuries have been held admissible to establish torture or serious physical abuse under aggravating circumstance (i)(5). See, e.g., State v. Smith, 893 S.W.2d 908, 924 (Tenn. 1994) (photographs depicting the victim's body, including one of the slash wound to the throat, which was "undeniably gruesome," were relevant to prove that the killing was "especially heinous, atrocious, or cruel" and were admissible for that purpose); State v. McNish, 727 S.W.2d 490, 494-95 (Tenn. 1987) (photographs of the body of the victim who was beaten to death were relevant and admissible to show the heavy, repeated and vicious blows to the victim and to prove that the killing was "especially heinous, atrocious, or cruel").

> The photographs in question depicted Mrs. Hall's body during the autopsy, prior to any surgical examination of her internal organs. While certainly not pleasant to view, they were illustrative of the testimony of Dr. Smith and highly relevant to the extent of abuse endured by Mrs. Hall prior to her death. They were not so gruesome as to have unduly inflamed the members of the jury. We find that the photographs were directly relevant to the existence of torture and serious physical abuse, necessary elements of the "especially heinous, atrocious or cruel" aggravating circumstance of Tenn. Code Ann. § 39-13-204(i)(5) (1991), and were properly admitted into evidence.

Hall, 8 S.W.3d at 602. We find this analysis applicable to the instant case, as well. The trial court ruled that the victim's post-mortem photograph was admissible as relevant on the issue of whether the victim's murder was especially heinous, atrocious, or cruel. The court found that "the State is going to be hard-pressed to prove that without this photograph." Indeed, while the medical examiner testified regarding the cause of death, he was unable to conclusively determine if the injury to the victim's head, which is depicted in the contested photograph, was caused by the gunshot wound that killed him or by a baseball bat injury prior to his death. Thus, the photograph was relevant to enable

the jury to make this factual determination.[6] Furthermore, while the picture is undeniably unpleasant, as it depicts the victim's face deformed by his injuries, we do not find that the picture is "so gruesome as to have unduly inflamed the members of the jury." Id. We therefore find that the trial court did not abuse its discretion by admitting the victim's photograph during the sentencing phase of the trial. Thus, this issue lacks merit.

## Trial Court's Prohibition of Comparative Sentencing Arguments

The defendant argues that the trial court erred by ruling that he could not introduce evidence of the sentence that his co-conspirator, Stacey, received and argues that his sentence should be comparable to Stacey's sentence. The defendant alleges that the trial court's ruling interfered with his constitutional right to present a defense and cites State v. Brown, 29 S.W.3d 427 (Tenn. 2000), in support of this allegation. As we discussed supra, Brown instructs that when determining whether a defendant's right to present a defense has been violated, "the analysis should consider whether (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." Id. at 433-34. In his arguments to this Court, the defendant has failed to include the length and terms of his co-conspirator's sentence and how his sentence differed from his co-conspirator's sentence. Therefore, he has not proven how this excluded information was critical to his defense and thus how he was prejudiced by the omission. Accordingly, we cannot properly evaluate the defendant's claim. See id. This issue does not entitle the defendant to relief.

## Admission of Hearsay During Sentencing Phase

The defendant complains that the trial court erred at the sentencing phase of the trial in allowing the state to introduce hearsay statements made by the victim's daughter through the testimony of the victim's wife. The defendant claims that the trial court should have excluded the hearsay statements because of their unduly prejudicial nature. Tennessee Code Annotated section 39-13-204(c) addresses the appropriate scope of admissible evidence in a sentencing hearing for first degree murder and provides, in pertinent part, as follows:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its

---

[6] A jury may disregard expert testimony and make its own factual determinations. See State v. Teresa Ann Coleman, No. 02C01-9503-CC-00083, 1996 Tenn. Crim. App. LEXIS 49, at *9 (Tenn. Crim. App. at Jackson, Jan. 31, 1996).

-16-

admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection (c) shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee. . . . The court shall permit a member or members, or a representative or representatives of the victim's family to testify at the sentencing hearing about the victim and about the impact of the murder on the family of the victim and other relevant persons. Such evidence may be considered by the jury in determining which sentence to impose. The court shall permit members or representatives of the victim's family to attend the trial, and those persons shall not be excluded because the person or persons shall testify during the sentencing proceeding as to the impact of the offense.

Tenn. Code Ann. § 39-13-204(c).

As our supreme court has noted many times, hearsay is admissible in first degree murder sentencing hearings.  See State v. Richard Hale Austin, No. W1999-00281-SC-DDT-DD, 2002 Tenn. LEXIS 400, at *11 (Tenn. at Jackson, Sept. 16 2002) (Southwest Reporter citation not yet available); State v. Odom, 928 S.W.2d 18, 28 (Tenn. 1996).  Moreover, victim-impact hearsay statements are admissible in these sentencing hearings, subject to the limitations that our supreme court has placed  on the admissibility of these statements.

> Victim impact evidence and prosecutorial argument on the evidence are not barred by the Tennessee Constitution or the Constitution of the United States. See [State v. ]Nesbit, 978 S.W.2d [872, ]889[ (Tenn. 1998)]. However, not all victim impact evidence is admissible. Victim impact evidence may not be introduced if (1) it is so unduly prejudicial that it renders the trial fundamentally unfair, or (2) its probative value is substantially outweighed by its prejudicial impact. See id. at 891. Generally, victim impact evidence should be limited to information which provides "a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." Id.

Richard Hale Austin, 2002 Tenn. LEXIS 400, at *22-*23.

The victim's wife, Joy Dodson, testified that after the victim's murder, her daughter pointed out some scuff marks on the wall that she claimed the defendant and his co-conspirator created, as well as a damaged desk, which she claimed was damaged during the fight. Ms. Dodson also testified that her daughter told her that the defendant drove her out into the woods and turned up the car radio; however, she still heard a loud "boom."  Ms. Dodson further testified that her daughter started having nightmares and exhibiting violent behavior after the victim's murder, which caused her to seek professional psychological treatment for her daughter. We conclude that this evidence was relevant to the sentencing hearing, as it addressed the emotional and psychological impact that the victim's death had on his immediate family. See Nesbit, 978 S.W.2d at 889.  Furthermore, we find

-17-

that the evidence was not unduly prejudicial to the defendant because evidence that was introduced at trial (1) that the defendant had struggled with the victim at his apartment and (2) that the defendant drove the victim's children into the woods at the time of and near the site of the victim's murder. Accordingly, we conclude that this issue lacks merit.


## Propriety of Prosecutor's Second Closing Argument During the Sentencing Hearing

The defendant complains that the prosecutor exceeded the scope of permissible subject matter in his rebuttal closing argument because he argued facts that neither the prosecutor nor defense counsel addressed in their initial closing argument. The state counters by arguing that the prosecutor argued facts that were related to a subject covered in his initial closing argument.

The state's rebuttal closing argument may not exceed the scope of the subject matter covered in the state's initial closing argument and the defendant's intervening closing argument. See Tenn. R. Crim. P. 29.1(b). Moreover, a party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). Beyond these limitations, the manner and conduct of closing argument is left to the discretion of the trial court. State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994). Generally, the trial court may afford both the state and the defense wide latitude in the scope of their closing argument. Id. In turn, the trial court is afforded wide discretion in its determination of the propriety of counsel's closing argument, and the court's decision will not be reversed on appeal absent a showing of an abuse of discretion. See Middlebrooks, 995 S.W.2d at 557; State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). For a defendant to be granted a new trial based on the prosecutor's improper comments during closing, the contested conduct must have affected the verdict to the prejudice of the defendant. See Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965).

In the instant case, defense counsel objected to the following portion of the prosecutor's rebuttal closing argument on the basis that the prosecutor was exceeding the permissible scope of this argument:

> The testimony from Mr. Stacey was that he met Mr. Tidwell in the bathroom. He took the bat, Mr. Tidwell had the trowel, and that he more or less ambushed Mr. Dodson. And he tells you that he hit him in the chest.
>
> What is significant about that, ladies and gentleman, is that the evidence in this case, the physical evidence in this case, does not show that. There are no wounds described by Dr. Harlan or in the medical examiner's report that show any bruising, any breaking of bones in the rib area.

In his initial closing argument, the prosecutor did not argue that the defendant lied about hitting the victim in the chest, nor did defense counsel address this subject in his closing argument. However, after a bench conference following defense counsel's objection, the trial court allowed the prosecutor to continue with his rebuttal closing argument.

As mentioned supra, the state's rebuttal closing argument is limited to subject matter covered in the proceeding closing arguments. See Tenn. R. Crim. P. 29.1(b). Accordingly, we find that the

trial court erred in allowing the prosecutor to argue facts that were beyond the permissible scope of his closing argument and by failing to issue a curative instruction. However, we find that the trial court's error was harmless because the defendant has failed to allege how he was prejudiced by this portion of the prosecutor's closing argument. This court cannot grant the defendant his requested relief for this error without a finding that the contested conduct affected the verdict to the prejudice of the defendant. See Harrington, 385 S.W.2d at 759. Thus, this issue does not warrant relief.

### Sentencing Challenge

The defendant complains that the trial court improperly sentenced him by ordering him to serve his concurrent sentences for conspiracy to commit first degree murder, especially aggravated kidnapping, and theft over $10,000 consecutively to his life without the possibility of parole sentence for his first degree murder conviction. "When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Id.

A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). However, before sentencing the defendant to serve consecutive sentences on the basis that he is a dangerous offender, the trial court must find that the resulting sentence is reasonably related to the severity of the crimes, necessary to protect the public against further criminal conduct, and in accord with the general sentencing principles. See State v. Imfeld, 70 S.W.3d 698, 708-09 (Tenn. 2002); State v. Wilkerson, 905 S.W.2d 933, 938-39 (Tenn. 1995).

The trial court found that the defendant was a dangerous offender and accordingly ordered him to serve his concurrent sentences for conspiracy to commit first degree murder, especially aggravated kidnapping, and theft over $10,000 consecutively to his sentence for first degree murder. When ordering the defendant to serve his sentences consecutively, the trial court specifically found that Mr. Tidwell is a dangerous offender based on the fact that his crimes involved cruelty, specifically "the beating of an individual in front of his children prior to taking him out in the woods [and then] taking the children with him [when taking the defendant to the woods to murder him]." The court further found that it believed that consecutive sentencing was reasonably related to the

severity of the offenses and that consecutive sentencing was appropriate after considering "all of the circumstances that were present at the trial." We note that the circumstances surrounding a criminal episode are proper considerations for determining whether to sentence a defendant to serve his convictions stemming from that episode consecutively. See, e.g., Imfeld, 70 S.W.3d at 708-09. We find that the trial court sufficiently analyzed the requisite criteria for classifying the defendant as a dangerous offender eligible for consecutive sentencing. Thus, the defendant was properly sentenced, and this issue lacks merit.

## **Conclusion**

For the foregoing reasons, we find that one of the defendant's issue merits a new trial and that the remainder of the issues raised in this appeal either have been waived or lack merit. Accordingly, the judgment of the lower court is REVERSED AND REMANDED for further proceedings consistent with this opinion.

_____
JERRY L. SMITH, JUDGE